J. S71044/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
   :        PENNSYLVANIA
          Appellee   :
   :
          v.   :
   :
   :
CARL DWAYNE BRIGGS,   :
   :
          Appellant   :   No. 881 MDA 2014

Appeal from the Judgment of Sentence November 22, 2013
In the Court of Common Pleas of Mifflin County
Criminal Division No(s).: CP-44-CR-0000331-2012

BEFORE: FORD ELLIOTT, P.J.E., PANELLA, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:        **FILED APRIL 23, 2015**

Appellant, Carl Dwayne Briggs, appeals from the judgment of sentence entered in the Mifflin County Court of Common Pleas following his jury conviction of driving under the influence ("DUI")—general impairment,[1] second offense, homicide by vehicle while driving under the influence,[2] and related offenses. Appellant (1) challenges the sufficiency and weight of the evidence and (2) argues his rights under the Confrontation Clause[3] were

---

[*] Former Justice specially assigned to the Superior Court.

[1] 75 Pa.C.S. § 3802(a)(1).

[2] 75 Pa.C.S. § 3735(a).

[3] **See** U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").

violated when the court allowed a laboratory supervisor, who did not draw or test Appellant's blood, to testify about his blood alcohol content ("BAC") test result. We affirm.

The trial court summarized the facts as follows. On the afternoon of October 8, 2011, Appellant was at the home of his friends, a husband and wife couple, and drank four twelve-ounce cans of beer over "several hours." Trial Ct. Op., 6/17/14, at 2. He left "around 3:30 or 4:00 p.m." *Id.* Witnesses Barry and Delores George were in their vehicle on Route 522 in McVeytown[4] when Appellant's car passed them. "Mr. George testified he was going slightly less than the speed limit [of] 55 miles per hour when Appellant passed him [by going into] the opposite lane of travel." *Id.* at 2-3.

The victims in this case, Judy and Bruce Kauffman, were on a motorcycle traveling toward Appellant in the same lane of travel. Mr. George testified "Appellant never took evasive action to avoid the motorcycle." *Id.* at 3. The two vehicles collided and the Kauffmans "died right away."[5] Both Mr. and Mrs. George "testified that the sun was bright and in their eyes." *Id.*

Doug Boozel, captain of the fire company, was off duty and a mile and

---

[4] *See* N.T. Trial, 9/10/13, at 74.

[5] *Id.* at 32 (Commonwealth's opening argument).

half to two miles away when he received a page about the accident. N.T. at 93. He arrived at the accident scene within approximately two minutes of the dispatch. *Id.* at 94. Boozel testified he

> briefly spoke with Appellant immediately after the accident[ and] recalled smelling an odor of alcohol on Appellant's person and Appellant's eyes were blood shot and glassy. Nick Price, EMT, who was at the scene shortly after the accident, testified that he smelled an odor of alcohol on Appellant's person. He testified that Appellant had a diabetic episode in the ambulance immediately following the accident. Trooper [Stephen] Griffith, [who] saw Appellant in the ambulance shortly after the accident[,] smelled an odor of alcohol on Appellant's person and Appellant was talking slowly. Appellant told Trooper Griffith that he had been drinking at his friend's house earlier.
>
> [Adrienne] Strouser testified she was employed by Lewistown Hospital as a medical technician and drew Appellant's blood at 6:07 p.m. on the day of the accident. The blood test indicated a .077% blood-alcohol content. Brian Seay, forensic toxicology supervisor at Quest Diagnostics, testified that Appellant's laboratory report[, introduced at trial as Exhibit C-9,] indicated a .079% blood-alcohol level.[6] J. Ward Donovan, board certified toxicologist, provided expert testimony that he believed Appellant's blood-alcohol level at the time of the accident was most likely between .1002% and .1084%. Dr. Donovan also testified that many individuals cannot actually tell when someone is impaired to the extent that [he is] incapable of safe driving and that a blood-alcohol level in the range of .09% to .11% would significantly impair someone's ability to safely drive a motor vehicle.
>
> Appellant testified that he has been a diabetic since he was nine (9) and that as a result of a medication change just weeks prior to the accident he had some significant diabetic episodes. Appellant testified that on the day of

---

[6] Seay is the witness whose testimony Appellant challenges in this appeal.

the accident he had four (4) Coors Light beers during his visit with [his friends]. Appellant left [their] residence to return home. Appellant testified that he remembers the events [from] leaving [his friends'] residence [to] stop[ping] at the red light in McVeytown [and then] no recollection of events . . . until he was in the parking lot of the Lewistown Hospital just prior to being treated in the emergency room. He testified, just as in other diabetic episodes he has had over the years, he had no memory of any of the events that occurred between the red light in McVeytown and the parking lot of the Lewistown Hospital.

Trooper [Richard] Leight testified that he spoke with Appellant at the Lewistown Hospital and that Appellant told him he thought he saw the motorcycle in the distance, but then as he was passing, the motorcycle was right in front of him. Also, he stated he tried to swerve to the left and that he believes that the motorcycle did the same and swerved in the same direction.

. . . [T]here was no sign of brake marks before the accident scene or any evidence that Appellant took any evasive action to avoid a head on collision with the oncoming motorcycle despite his statement to Trooper Leight that he saw the motorcycle in the distance.

Trial Ct. Op. at 3-4.

The case proceeded to a three-day jury trial on September 10, 2013. As stated above, Appellant admitted he drank four cans of beer that afternoon, but argued he was not intoxicated or impaired, and instead the accident was caused by (1) a diabetic episode, in which he normally becomes "zombie-like" or "unresponsive," or (2) the sun and glare. N.T. at 46-47 (Appellant's opening argument).

The jury found Appellant guilty of DUI—general impairment, second offense, and two counts each of homicide by vehicle while DUI, homicide by

vehicle,[7] and involuntary manslaughter.[8] The court also found Appellant guilty of the summary offense of limitations on overtaking on the left.[9] On November 22, 2013, the court imposed an aggregate sentence of six to twelve years' imprisonment.[10]

Appellant filed a timely post-sentence motion. The court held a hearing on April 17, 2014, and denied the motion on April 28th.[11] Appellant took this timely appeal and complied with the court's order to file a Pa.R.A.P.

---

[7] 75 Pa.C.S. § 3732(a).

[8] 18 Pa.C.S. § 2504(a).

[9] 75 Pa.C.S. § 3305.

[10] The sentences are as follows: (1) for two counts of homicide by vehicle by DUI—two consecutive sentences of three to six years' imprisonment; (2) for two counts of homicide by vehicle—two concurrent sentences of one to two years' imprisonment; and (3) for two counts of involuntary manslaughter—two concurrent sentences of one to two years' imprisonment. *See* 75 Pa.C.S. § 3735(a) (providing mandatory minimum sentence of three years' imprisonment for homicide by vehicle by DUI and requiring consecutive three-year term of imprisonment for each victim); ***Bell v. Commonwealth***, 96 A.3d 1005, 1017 (Pa. 2014) (stating homicide by vehicle and homicide by vehicle while DUI do not merge for sentencing purposes).

[11] Pursuant to Pennsylvania Rule of Criminal Procedure 720(B)(3)(a), the trial court had 120 days from the December 2, 2013 filing of the motion—or until April 1, 2014—to rule on it, or the motion would be denied by operation of law. *See* Pa.R.Crim.P. 720(B)(3)(a). On February 27, 2014, Appellant filed a motion to enlarge the time for the trial court to decide the post-sentence motion, averring he needed time to obtain the funds to pay for a trial transcript. *See* Pa.R.Crim.P. 720(B)(3)(b) (providing court may grant, upon timely defense motion and for good cause shown, one thirty-day extension for decision on post-sentence motion). The trial court granted the enlargement of time, thus extending the deadline for a decision to May 1, 2014. As stated above, the motion was denied on April 28th.

1925(b) statement of matters complained of on appeal. He presents two issues for our review: the sufficiency and weight of the evidence and the trial court's admission of Brian Seay's testimony.

In his first and second issue, Appellant challenges the sufficiency, and in the alternative, the weight, of the evidence for homicide by vehicle while DUI.[12] Specifically, he avers the evidence was insufficient to establish he committed DUI or was intoxicated or impaired by alcohol. In support, he cites the following trial testimony: (1) his friend's wife, whom he was visiting, stated Appellant did not appear intoxicated while he was at her house; (2) Price, the responding EMT, testified Appellant was alert, oriented, and articulate and did not exhibit any intoxicated characteristics, Price gave Appellant fifteen grams of glucose at 5:09 and again at 5:15 p.m., and that while in the ambulance, Appellant suffered a diabetic episode; (3) Dr. Theodore Hetrick, the emergency room doctor who treated Appellant, testified he did not see any signs that Appellant was impaired by alcohol and concluded he suffered a hypoglycemic episode; (4) Dr. Lawrence Guzzardi, Appellant's expert toxicologist witness, testified "clinical observations are probably much better than blood-alcohol tests taken a period of time after an accident especially when made by a doctor, such as Dr. Hetrick, an EMT such as Nick Price, a paramedic, with an emergency doctor being the best

---

[12] Appellant has preserved a weight of the evidence claim, as he raised it in his post-sentence motion. *See* Pa.R.Crim.P. 607(A)(3).

individual [sic]," "the data was poor for attempting to determine [Appellant's] blood-alcohol level at the time of the accident," and "the most likely cause of the accident was hypoglycemia along with some sort of diabetic inattention," Appellant's Brief at 53-54; and (5) Appellant's mother and sister both testified he previously had eye surgery which caused him to "always [have] bloodshot eyes."[13]  *Id.* at 57.  Appellant concludes two "equally reasonable and mutually inconsistent inferences could be drawn [and] the factfinder should not have been permitted to guess which inference it chose to adopt, especially when one . . . of the two . . . guesses resulted in depriving [Appellant] of his liberty." *Id.* at 58.  We find no relief is due.

Preliminarily, we find Appellant's arguments go to the weight of the evidence, and not the sufficiency.  Appellant himself cites the evidence that he drank four cans of beer on the afternoon of the accident and that two BAC tests yielded results of 0.077% and 0.079%. *Id.* at 5, 58.  Indeed, he argues two "equally reasonable" inferences could be drawn. *Id.* at 58; *see Commonwealth v. Landis*, 89 A.3d 694, 699 (Pa. Super. 2014) (stating claim that verdict is contrary to weight of evidence concedes there is sufficient evidence to sustain verdict).

In considering Appellant's weight of the evidence claim, we are guided

---

[13] In support of his argument, Appellant extensively cites fifteen witnesses' testimony, including his own.  Appellant's Brief at 46-58.

by the following principles.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [fact-finder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [factfinder's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Landis*, 89 A.3d at 699 (citation omitted).

> [B]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* (citation omitted).

Appellant was convicted under the following subsection of the DUI statute:

> (a) General impairment.
>
> (1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving,

> operating or being in actual physical control of the movement of the vehicle.

**See** 75 Pa.C.S. § 3802(a)(1). "To prove homicide by vehicle while DUI, the evidence must show that the accused unintentionally caused the death of another person as the result of driving in violation of section 3802. 75 Pa.C.S. § 3735." **Commonwealth v. Cruz**, 71 A.3d 998, 1006 (Pa. Super. 2013), *appeal denied*, 81 A.3d 75 (Pa. 2013).

As stated above, Appellant contends "two . . . equally reasonable and mutually inconsistent inferences could be drawn from the same set of circumstances." Appellant's Brief at 58. We disagree with this premise.

The principle cited by Appellant was announced by the Pennsylvania Supreme Court in **Commonwealth v. Woong Knee New**, 47 A.2d 450 (Pa. 1946) ("**New**").

> In [**New**], the conviction was based entirely on evidence which placed defendant with the victim at the victim's home shortly before the victim was there murdered. There was, however, no evidence which tended to prove that the defendant had committed the crime or which cast doubt on the equally likely possibility that an unknown assailant had killed the victim after the defendant had left his company. In reversing the conviction [the Court] noted that:
>
> > When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." [**New**, 47 A.2d at 468.]

**Commonwealth v. Hubbard**, 372 A.2d 687, 691-92 (Pa. 1977). In

support of his argument, Appellant cites **Hubbard** and **Commonwealth v. Tribble**, 467 A.2d 1130 (Pa. 1983).[14]

In **Hubbard**, the defendant argued the evidence was insufficient to establish murder in the second degree. **Hubbard**, 372 A.2d at 690. The Pennsylvania Supreme Court disagreed, distinguishing the case from **New**:

> This case is not [**New**. T]he evidence tended to show that the victim's body was deposited [in a cornfield] after the strangulation occurred. Thus the murderer would likely be a person whose presence in the cornfield at some relevant time could be established. Despite repeated denials, [the defendant] was placed in that cornfield, at the very point where the body was found. The finding of a clear print of his boot-heel underneath the victim's body would indicate that [the defendant] had stood on that spot shortly before the body was deposited. That the victim was last seen alive boarding an automobile which matched the description of a car owned by [the defendant], at the beckoning of a man with whom the victim was apparently familiar, permits an inference that [the defendant] was the driver of that vehicle. Tire marks from this vehicle were found in the cornfield and were made at the relevant time. We cannot say that the jury acted unreasonably in concluding that this combination of circumstances proved defendant's guilt beyond a reasonable doubt.

**Id.** at 692.

In **Tribble**, the defendant was fired by his employer on April 17, 1980. **Tribble**, 467 A.2d at 1131. The defendant "returned to the job site some

---

[14] Appellant also cites **Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002). However, unlike his citations for **Hubbard** and **Tribble**, he provides no pinpoint citation, and our review of **Grant** reveals no discussion pertaining to mutually inconsistent references arising from the same facts. **See Grant**, 813 A.2d at 738 (announcing general rule that defendant should wait until collateral review to raise claims of ineffective assistance of trial counsel).

time in June of 1980 to inquire about the possibility of being rehired." *Id.*

On June 19, 1980, several trucks owned by the employer were broken into;

"hand and power tools were missing from" one truck and tools were moved

from another truck to two others. *Id.* "The trucks had been locked the

night before the break-in and secured behind a high chain link fence." *Id.*

The defendant's fingerprints were found on "the driver-side door button of"

one truck and "the driver-side wing window of" another. *Id.* He was found

guilty at a jury trial of theft of movable property.[15] *Id.* at 1130. On appeal,

the Pennsylvania Supreme Court reversed, holding:

> While it is a reasonable inference that [the defendant's]
> fingerprints were impressed on June 18th or 19th, an
> equally reasonable inference may also be drawn that [his]
> fingerprints were impressed prior to the time of the break-
> in, since [the defendant] was in frequent physical contact
> with the trucks when he worked [there] only two months
> prior to the break-in and/or when he returned to the site in
> June only days prior to the break-in. Furthermore, there is
> no evidence that these trucks were used frequently; a fact
> which, if established, would diminish the possibility that
> the prints were old.

*Id.* at 1131.

In the instant appeal, Appellant misconstrues the phrase "[w]hen two

equally reasonable and mutually inconsistent inferences can be drawn from

the same set of circumstances." *See Hubbard*, 372 A.2d at 692 (citing

*New*, 47A.2d at 468). In *New* and *Tribble*, the **same set of facts**

---

[15] *See* 18 Pa.C.S. § 3921(a) (theft by unlawful taking or disposition/movable property).

supported two equally reasonably inferences. In **New**, evidence that the defendant was at the victim's home equally supported findings that he killed the victim and he was merely present and left before someone else arrived and killed the victim. **Hubbard**, 372 A.2d at 691-92 (citing **New**, 47 A.2d at 468). In **Tribble**, the presence of the defendant's fingerprints equally inferred the fingerprints were made on the night of the break-in and previously when he was employed there. **Tribble**, 467 A.2d at 1131. In **Hubbard**, in which the Supreme Court distinguished **New**, the defendant denied he was in the cornfield. **Hubbard**, 372 A.2d at 692.

We find the instant case akin to **Hubbard**. The Commonwealth presented evidence that tended to show Appellant was impaired by alcohol at the time of the accident. Appellant, meanwhile, presented evidence that he instead was suffering from a diabetic episode. Accordingly, the principle in **New** does not apply, as the two inferences—alcohol intoxication and diabetic episode—did not arise from "the same set of circumstances." **See Hubbard**, 372 A.2d at 692. Instead, the two inferences arose from competing evidence presented by the parties at trial. Appellant's rationale— that the jury "should not have been permitted to guess which inference it chose to adopt"—would require acquittal whenever a defendant advances an alternative theory of the case. This was not the holding announced in **New**. Instead, in the instant matter, the jury was free to believe all, part, or none of the evidence presented by both parties, and its finding that Appellant

committed DUI is not so contrary to the evidence that it shocks one's sense of justice. *See Landis*, 89 A.3d at 699. We therefore hold the trial court did not abuse its discretion in denying Appellant's weight of the evidence claim in his post-sentence motion. *See id.*

Appellant's third claim on appeal is that the court erred in allowing Brian Seay, the supervisor of forensic toxicology at Quest Diagnostics, to testify about the blood test results obtained in his laboratory. We note, as did the trial court, that at the time of trial, only the Superior Court opinion in *Yohe* had been issued. *See Commonwealth v. Yohe*, 39 A.3d 381 (Pa. Super. 2012), *aff'd*, 79 A.3d 520 (Pa. 2013), *cert. denied*, 134 S. Ct. 2662 (U.S. 2014). Approximately one and a half months after trial, and while Appellant's post-sentence motion was pending, the Supreme Court affirmed the Superior Court's decision in *Yohe*. *Yohe*, 79 A.3d at 523, 543. Because Appellant's claim pertains to *Yohe*, as well as *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (U.S. 2011), we summarize those decisions first.

In *Yohe*, our Supreme Court stated:

> Whether the admission of the Toxicology Report violated Appellant's rights under the Confrontation Clause is a question of law, for which our standard of review is de novo and our scope of review is plenary.
>
> The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."[ ] . . . The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is

unavailable and the defendant had a prior opportunity for cross-examination.[ ]

*Yohe*, 79 A.3d at 530-31 (citations omitted).

In ***Bullcoming***, the defendant was charged with driving while intoxicated, and, at his subsequent trial, the laboratory report of his BAC was offered into evidence. The report was completed, signed, and certified by an analyst who was not called to testify. Instead, the prosecutor called as a witness another analyst from the same lab to testify generally about lab procedures and equipment. . . .

*Id.* at 527 (citing ***Bullcoming***, 131 S. Ct. at 2709, 2711-12). The United States Supreme Court held the trial court erred in "permit[ing] the testimonial statement of one witness . . . to enter into evidence through the in-court testimony of a second person . . . " *Yohe*, 79 A.3d at 527 (citing ***Bullcoming***, 131 S. Ct. at 2713). "The [***Bullcoming***] Court specifically disapproved of such 'surrogate testimony,' which could not have conveyed 'what [the certifying analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed,' nor would it 'expose any lapses or lies on the certifying analyst's part.'" *Yohe*, 79 A.3d at 527 (citing ***Bullcoming***, 131 S. Ct. at 2715).

In *Yohe*, the trial court admitted into evidence a toxicology report authored by a toxicologist and assistant laboratory director, Dr. Lee Blum, as well as the expert testimony of Dr. Blum. *Yohe*, 79 A.3d at 524. "Dr. Blum did not handle [the defendant's] blood sample, prepare portions for testing, place the prepared portions in the machines, or retrieve the portions after

- 14 -

testing[.]" *Id.* at 540. However,

> he reviewed the case folder, verified the chain of custody information and examined the personal identification information[,] checked the testing that was performed and the data that resulted, evaluated the [raw] analytical data from the duplicate gas chromatography and the enzymatic assay, compared the results of the two gas chromatography tests, compared the result of the enzymatic assay test to the two gas chromatography tests, ensured that these numbers supported each other, and reported the lowest of the two gas chromatography test results as [the defendant's] BAC.

*Id.* at 539-40 (emphases omitted). The Pennsylvania Supreme Court held:

> . . . Dr. Blum is the analyst who determined [the defendant's] BAC. Although he relied on the raw data produced by the lab technicians and utilizedthis raw data in reaching an expert opinion premised on his evaluation of the case file, he is the only individual who engaged in the critical comparative analysis of the results of the gas chromatograph tests and the enzymatic assay and determined [the defendant's] BAC.

*Id.* at 540. The Court thus concluded the Commonwealth "complied with *Bullcoming* by assuring [the defendant's] right to be confronted with the in-court testimony of the right to be confronted with the in-court testimony of the scientist who evaluated the raw data in the case file and signed the certification." *Id.* at 541.

In the instant appeal, Appellant avers "Mr. Seay's involvement in reviewing [Appellant's] blood test results clearly falls far short of the standards set forth by the Supreme Court in" *Yohe*. Appellant's Brief at 66. Appellant acknowledges Mr. Seay's testimony that "he was involved with the volatiles blood testing portion of the tests," but maintains Mr. Seay's

conclusion was not based on his own analysis of the raw data and that "Mr. Seay did not independently determine and certify the results." *Id.* Appellant concludes "Mr. Seay was a surrogate witness" under *Bullcoming*, and thus his right to confrontation under the Sixth Amendment was violated. We find no relief is due.

In the instant case, Brian Seay's testimony at trial was relatively brief. *See* N.T. at 190-203. With respect to his role in this case, Mr. Seay testified on direct examination by the Commonwealth that he "reviewed the data." *Id.* at 191. The following exchange occurred:

> [Commonwealth:] . . . What is your involvement in regards to the report[, Exhibit C-9,] I'm about to hand you?
>
> [Mr. Seay:] My involvement was to review the results of the test performed by the technologist.
>
> Q. Do you normally do that?
>
> A. Yes. It's a normal standard operating procedure for a certified scientists to review the results before released [sic]. The technologists are not qualified to review and release results.
>
> * * *
>
> Q. And what involvement and the results regarding C-9, please [sic]?
>
> A. I was involved with the volatiles blood testing portion of this test which lists the methanol, ethanol, isopropanol, and acetone results. And we have [a BAC of 0.079%.]

*Id.* at 193-94.

- 16 -

On cross-examination, Mr. Seay responded to defense counsel's questions as follows:

> [Mr. Seay:]   I did not perform the testing, but I reviewed it.
>
> *   *   *
>
> [Appellant's counsel: You did not receive the specimen or log it into your computer system?]
>
> [Mr. Seay:] Only thing I did was enter the results to be released.

*Id.* at 197-98.

The above passages are the sum of Mr. Seay's testimony as to what actions he took in this case.   We agree with Appellant that this is less descriptive than the actions testified to by Dr. Blum in ***Yohe***.   ***See Yohe***, 79 A.3d at 539-40.   Nevertheless, we disagree that Mr. Seay was merely a surrogate witness under ***Bullcoming***.   In ***Bullcoming***, the witness was merely "another analyst from the lab [who] testif[ied] generally about lab procedures and equipment."   ***Yohe***, 79 A.3d at 527.   Here, Mr. Seay testified that he "was involved with the volatiles blood testing" and that he reviewed the results of the test, where the technologists were not qualified to review and release results.   N.T. at 193.   Accordingly, we agree with the trial court "that he was competent to testify to the truth of the statements made in the report and that Appellant's right to confrontation was not violated."   ***See*** Trial Ct. Op. at 6.

Furthermore, **if** the court erred in allowing the evidence, we would

hold it was harmless error.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Atkinson*, 987 A.2d 743, 752 (Pa. Super 2009) (citation omitted).

Appellant does not challenge the testimony of Adrienne Strawser, who drew and tested his blood at Lewistown Hospital. Ms. Strawser testified she drew one test tube of blood from Appellant and tested it herself for blood alcohol content, and the test showed a BAC of 0.077%. N.T. at 168. She drew four additional tubes to send to Quest for test toxicology testing; Quest happens to also test for alcohol. *Id.* at 168-69. Ms. Strawser's test result was lower than that of Quest; Seay testified the Quest test yielded a BAC of 0.079%. Accordingly, Mr. Seay's testimony did not prejudice Appellant and was cumulative of Ms. Strawser's testimony, and the Commonwealth's "properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *See Atkinson*, 987 A.2d at 752.

Finding no relief due on Appellant's claims, we affirm the judgment of

sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/2015